The next case is North American Sugar Industries v. various defendants, including Goldwind Science & Technology. Craig Bono is here for the appellate, North American Sugar. Sean Morata is here for Goldwinds. Patrick Boyle is here for, I'll abbreviate, DSV and AIR. And Christopher Carver is here for, I'll abbreviate again, BVCS. Mr. Bono, you may begin your argument. Thank you, Your Honor. May it please the Court, my name is Craig Bono and I represent North American Sugar, We're here today because the District Court incorrectly held on a 12B2 motion to dismiss on personal jurisdiction that none of the defendants in this case were subject to jurisdiction in Florida under Florida's long-arm statute. The District Court decision turned on the adoption of a magistrate judge's decision which turned on a holding that the underlying trafficking conduct that was alleged in this case occurred solely in Cuba. So counsel, you don't have a ton of time, and if you don't mind, I'm going to jump right in. So assume for the moment, and just assume this, that I agree with you that there was at least a misunderstanding about the nature of the violation here. And that I agree that there was a violation that was committed under the third section of the definition of traffic because putting the boat in Miami was an essential and foundational part of doing this, or at least routing it through the mechanism of getting the boat to Cuba required that it be done in the United States, and coming to Miami was part of that plan. And so let's say I agree with you on the Del Valle part of your argument. There's still another link that you have to show, and that is that one of the folks at the table to your right did something in Florida to make that happen. And I'm having trouble with that part of it. So can you focus on that part of it for me? I absolutely can. Thank you, Your Honor. So there are two points. So the first point is, and you referenced that at least one of them needs to have done something in Florida. Well, that's fair. So tell me, give me your strongest one that did something in Florida. Can I ask? You can answer the question, but just to set the floor, this is a conspiracy. You've alleged a conspiracy. So this question certainly goes to the conspiracy jurisdiction underlying our conspiracy angle. We also allege that each one of them committed a tort in Florida, and thereby they're independently. But I understand your question. Give me your strongest one. I hear you. I hear you. So I think we need to take a step back and understand. I'm going to get to it. I promise. Here's what I'll answer your question first, and then I'll take a step back. Thank you. So the answer is BBC Singapore, I think, is the strongest. That's the one with the Miami office? No. The DSV has the Miami office. So I think that's, that would be my second. Tell me why BBC. What did BBC Singapore do in Florida? BBC Singapore hired port agents in Florida to be on the ground on the, in the dirt of in Florida. I've looked at as much of the record as I possibly can and digested it. It's big, but I've looked at as much of it and digested as much of it as I can. And it seems to me that it was not BBC Singapore that hired the port folks in Miami. Show me where you, your best evidence that they are the ones that actually are the hiring entity for them. Not the one that communicated with the Miami one. We'll get to that. I'm sure. But that they are the ones that hired the Miami port. So I don't have the, I can get the record site for you on rebuttal. But the, so this is, this is why I wanted to take just a quick step back. This is a complicated transaction. This is a huge, it's a global, a, it's a global transaction to have been a whip to, for a Chinese company with a Hong Kong affiliate to build a wind farm in Cuba. And then to create the turbines that are on that wind farm in China, shift them across the globe, going through all of the logistics of just bringing a ship that. And counsel, I agree. And I can tell you that everyone here has tried to unpack all of this, but corporate formalities matter. And you sued some people. You sued, you didn't sue others. I assume there's reasons for why things are done the way they are. I don't question those, but I do do take the ball as it exists. I, I hit the ball as it is hit to me. So the ball is it's hit to me is I, as I understand it, BBC Singapore is not the hiring entity. Now there may be a, another BBC entity that did the hiring of the Miami port authority, but not the folks. As I understand it, we're sitting at that table. What else did BBC Singapore do in Miami or in Florida? So I believe BBC Singapore, and I'm going to get you the record site. BBC carriers is the Chinese company that BBC Singapore was the agent for. BBC Singapore was the contracting agent with the agents in Florida. Now were they doing that in their role as agent for BBC carriers? Maybe, but they were all five, they were all participants in their slice, right? This is a big transaction, like I mentioned, and no one company can do any of this by themselves. It's too complicated. No, there's no business that does all of this. So they all have to play a role and Helms Burton is designed to encompass all of those entities whenever you just do a little slice. That is why Roman at three in particular is so broad. So even your little slice, if you participate, then you're on your, you fall within the context of, of the Helms Burton violation. Let's assume I look at the record and I don't see that BBC Singapore was the hiring entity. Okay. What else? So then each one of, okay, so let's start with, let's go to DSV because they have an office in Miami. Okay. So that's the one that, that judge will go is asking about. That's the one who has, that's the one that has the office in Miami. DSV U.S. The only reason they're involved. And you allege that they're involved in the conspiracy, correct? I'm sorry, say that again. You allege in the complaint that they're involved in a conspiracy. Correct. We allege that all of the defendants are involved. Correct. I understand. But under Florida law, if you have one, one co-conspirator, you have jurisdiction for all the co-conspirators. Correct. And so that entity, the reason they're involved is because this ship is coming to Florida. The only reason, the initial DSV entity that was involved in this was a Denmark entity. That entity brought- Well, it's coming to Florida or it's coming to the United States because they need, they need to have the shipment for purposes of the GE company, LM, to be involved with the wind turbines. They need to have a port in the United States first, correct? Correct. As part of the, the allegation that you make. That's right. In order to satisfy various sanctions related to Cuba. They chose Miami. They did it on, they purposefully chose Miami. Obviously it's the most convenient port to Cuba. It could have, could they have done this through New York or LA? Sure. But they didn't. Here's, here's my concern with the, the office, the DSV office in Miami. There is evidence on their side, and I don't think you would dispute this, that says that office was not involved in any aspect of this. That evidence exists. You have presented some evidence that the entity was on, that someone was CC'd on a bunch of emails about 20 something, 22, 21, and that the Miami entity was listed at least in some drafts of the ISF document and some of the documents that were filed with the port authorities and with the licensing entities. Am I, do I, have I described that correctly? You have. Okay. Didn't the district court make a finding based on that conflict in evidence that sided with the folks at the table to your right and not with you? The district court did, but- Don't you need to have an evidentiary hearing since there's conflicting testimony? There was no evidentiary hearing, and instead the district court just, rather than going towards the plaintiff's side on an inference, the district court went the opposite direction, which of course isn't appropriate at this stage. But more to the point, the, the, the lady in the Miami office that received these emails received the, the first email she received on her own. Then she received subsequent emails, 21, 22 subsequent emails that she was copied on. She didn't respond to any of them. That is all true. We don't dispute that. That's what the record would suggest. Did any of the emails have anything to do with the, with this case? All of the emails have to do with this case. All of the emails were related to this stop in the port of Miami because that's what DSVUS was doing. They were organizing the regulatory side to ensure the appropriate forms were provided at the port of Miami so that they could solve the sanctions problem they were trying to solve. DSV, without DSV involvement, the ship doesn't come to Miami. So it's not, all of the defendants effectively want to say, we didn't drive the ship into Miami and so therefore we have nothing. What are we talking about? Why, what are you even talking about it with us in Florida? But it's, it's, it's, it's entirely too deep into the weeds to say, if you don't drive the ship, then you didn't do anything. I know, but there has to be some act in Miami and for someone just to receive emails to be CC'd on them where there is direct evidence to suggest that she had no involvement and in some instances didn't even look at the emails and the district court credited that testimony. I just, I'm having a hard time seeing how that could possibly, that's not a conflict of evidence. That's just what the evidence is. Well, now the harder, the better evidence for you, I think is the reference to the address on some of the licensing stuff. How do we deal with that? Similarly, the only evidence we have is the documentary evidence that has the address on the license. Now, just as though in their, in the affidavit that they put in, it wasn't live testimony, but in the affidavit that they put in, they said, look, she didn't do anything, which they can say it, but the documents would suggest that she must've done something. Why did she receive 22 emails? Similarly, they say, look, what we provided to the US government didn't actually have our real Miami address on it, but we don't have those documents. The documents we have, they produced these, these documents were all within their control during jurisdictional discovery. The only documents we got have that Miami address on them. We don't have any other documents for them to say, well, but that's not what we gave to the US government. We just don't have a copy of the one we actually gave. Can't be credited at this stage. Thank you. All right. Mr. Murata. Thank you, Your Honor, and may it please the court. Sean Murata on behalf of the Goldwyn-Appellees. I'm going to address sort of issues that are common to all the defendants, as well as any Goldwyn questions you have, and then my colleagues from DSV and BBC will answer any questions you might have about their particular facts or their particular situation. I think the questions get strongly at what the problem is in this case for NAZI, which is that the people who are alleged to be the masterminds of this entire scheme, LM, BBC charting, chartering, and DSV Denmark, are not defendants in this case, and in fact LM is not even alleged to be a co-conspirator in this case. So if they are relying on conspiracy jurisdiction to establish personal jurisdiction in this is not only not a defendant, they're not even alleged to be a co-conspirator. Let's get to the heart of it, though, which is what acts were committed in Florida or caused to be committed in Florida. There's no doubt the boat got here. In my view, that is pretty close to causing, directing what ended up happening in Cuba. The missing link for me, or the harder part, is connecting your clients to that activity. And I think it's particularly hard for Goldwyn because conspiracy jurisdiction under this court's decision in United Technologies requires proof of meetings of the mind with at least one other co-conspirator. And the evidence is replete that the only person that Goldwyn had contact with was, was LM. No, that's not. That's not the law in Florida. Well, it's also, I don't know that that's even true as a matter of the record. I mean, didn't you all have contact with BBC Singapore? No, Your Honor. We had contact. There's no contractual documents between your client and BBC, and BBC chartering with Singapore as the agent for chartering? That's not my understanding, Your Honor. It's that LM engages DSV, DSV engages BBC chartering. Now what Goldwyn does do is for, you know, certain customs documentation, they said you've got to send certain information out. You know, we need, we need to know what to put in the boxes. But that's not contracting with them. It's like if Federal Express says to you, hey, we need your information for this shipment, and then they decide, hey, we're going to ship it through our Nashville hub, you know, you're not agreeing with them to do anything. It's just the person you've hired to go ahead and transport your goods requires certain information from you. There isn't a meeting of the minds. And with respect, Judge Lagoa, that is a direct quote from this court's decision in United Technologies. There has to be a meeting of the mind with at least one other co-conspirator, and LM is not alleged to be a co-conspirator. And if you look at the record, document 218-24, those are DSV emails that say LM is our customer, and in fact, at the beginning of that chain, LM says, I don't even know who DSV's ultimate customer is. They didn't know about Goldwyn at first. With the Blade Supply Agreement at 218-8, LM is going to be the one who obtains the license and qualification. Document 241-1, DSV U.S. deposition where they say there's no relationship between Goldwyn and DSV that he's aware of. So at 218-5, that's the Goldwyn deposition where it says the Cuban customer required Goldwyn to use LM as a supplier, and they had really no reason to understand why this stopover was taking place except there was something involving a U.S. customer. And there's 218-7 where Goldwyn's deposition says, I only know what LM told us, and LM is a U.S. company and the products are U.S. products. That's why they have to stop by a port in the U.S. So from Goldwyn's perspective, all they contact is with LM, and they're copied on certain – so maybe what you're suggesting, there is in the record, Judge Luck, that they are on certain email updates about where the ship is. But they are not involved in this so-called BIS loophole scheme, have nothing to do with it. They're not indemnified, DSV, for potential damages resulting from sanctions violations? They – so they signed on to an indemnification agreement that said if there are customs problems, because of course they're the ones providing the information about what these goods are, then yes, we are responsible for that. But they are not responsible – they didn't plan the BIS loophole scheme that Nazi talks about. They didn't do any of that. LM is driving the process. They're not even a – Are you profiting from having the wind turbines delivered to Cuba? I think we are profiting – And isn't that part of Section 3? That is part of Section 3, but – Which is basically – it's like a little piece of a puzzle. Anybody who touches the puzzle is now on the hook. Section 3 requires us to profit from an underlying trafficking that takes place. Now I take it the allegation is the underlying trafficking is the stopover in Miami. But under Section 2, a trafficking violation requires that the stopover benefit from the port in Cuba. But as we point out in the brief, it's actually the opposite of the way around. If anything, it's not that the stopover in Miami benefits from Cuba, it's that the unloading in Cuba benefits from the port stopover. But here we're talking – there's a – we're in a Rule 12b motion, correct, right? So it's the underlying facts of the complaint, and the complaint says that this is a conspiracy and a stop in the United States. It didn't have to be in Miami, as your friend on the other side pointed out. It could have been in Texas. It could have been anywhere. But you still would be on the hook under Helms Burden Act. The issue here is you needed to have a port in the United States in order to – to have LM involved in order to get around the sanctions for purposes of GE being able to provide the wind turbines. That's what the allegations are in the complaint. Whether they're true or not, I don't know. Is that not the allegation in the complaint? That is the allegation in the complaint, Judge Lago. And I take Judge Luck's sort of initial premises of some of the questions to say, I think that's sufficiently essential for Florida long arm. I do want to push back on that, Your Honor, because for both the essentiality requirement under Watts, which is a case discussed in the brief, and the connectivity requirement that the Florida Supreme Court required – I'm not talking about, though – don't misunderstand me as you're pushing back on me. Don't misunderstand that I'm talking about the test under personal jurisdiction for Florida law. I'm talking about the violation part. And for violation, we're looking solely at whether the conduct here is alleged is a potential violation of the Helms-Burton Act. And there, causing, participating in, profiting from, as Judge Lago has said, that all – if that's done for the trafficking, which happened in Cuba, if that's done in Florida, which stopping the boat seems to have been – at least somebody did that, that seems to be a violation part of it. My – where I'm hung up on is, did you guys do that? Somebody did it, but did you or one of your co-defendants do that? Right, and I think I've been explaining, I think, why none of us did, and I think particularly Goldwyn did not. Right. But I do want to, at least for at least the Florida long arm statute, push back on the notion that it's essential, such that there can be tortious act, long arm jurisdiction, because – If there's a statutory violation, though, that meets the violation part, and the only question is whether the defendants did that in Florida. That's the question. I think there is – it's a question of whether I think any defendant did it in Florida. I agree. And that's all – that's the only point that I was asking your – I don't think anyone misunderstood until you pushed back, but other than that, I think we all were on the same page. All right. Thank you, Your Honor. Boyle? Thank you, Your Honors. Patrick Boyle for DSV. Let me start by answering some of those questions. Carol Scheid is the Miami employee who received about 20 emails. We know that because we produce thousands of documents, and so we know the 20 emails she received. We know she didn't respond to any because we have none of her responses, and all the same people were in the emails and received no responses in all the others. So not only do we know for a fact Carol Scheid didn't respond, we know who from DSV did do the things that the plaintiff is alleging. Why is there not a reasonable inference that could be drawn from the evidence based on the emails, plus – and I agree with you, the email inference would be weak and maybe not enough by itself – plus the fact that the Miami address was used on the license applications, at least some drafts of it? I know there's some evidence to suggest that didn't make the final drafts. I know there's evidence to suggest that New Jersey is the one that prepared the documents and filed them. But why is there not at least an inference of fact or a dispute of fact on whether the plaintiff was involved in this? Yes, Your Honor. The record does contain the information, although subtly. You see when Keith Gula sends the – does the filing for the Jade, and you see when Linda Esposito does the filing for the Moonstone, all they can do when they email back and forth to other people who – to say I've done the filing, because that's all they were asked to do is to do this filing that said it was going to come to port and it was going to be freight remaining on board. In other words, the customs people were told exactly what happened. All they can do is send screen grabs, and they say this is what was filed in Descartes and D-E-S-C-A-R-T-E-S. It's an electronic filing system. The customs do not take paper anymore. They haven't since 2015, the U.S. customs. So when we talk about first drafts of filings, we just want to make sure that everyone understands it isn't – there isn't a final version that's signed and embossed. It is – it is only done electronically. I understand all of that. Okay. My question simply is the fact that there's this address in whatever mechanism it gets filed, and I understand what you're saying, of Miami, does that not lead to an inference that the Miami office was in fact involved in clearing the ship to come to the Miami port? That document, your honor, the record contains and the evidence that that document was actually first produced by the China DSV entity, and it was sort of like to show what – to show something about what would be communicated. That's the only point of it. I'm not saying, counsel, that there isn't an explanation for it, and you may in the end be right, but I guess the question that I'm leading up to is, and I'll ask it, does that not mean there needs to be an evidentiary hearing under Florida law, or can a district court, based on affidavit testimony that you provided that this was – Miami had nothing to do with this, versus inference that they provide in documentary evidence, is an evidentiary hearing required under Florida law? Your honor, I believe this was the most exhaustive personal jurisdiction mechanism and review I've ever seen. You know, deposition, six-hour depositions of multiple parties, thousands of emails produced. Counsel, can you answer my question? I don't think an evidentiary hearing was necessary for the court to conclude the things the court concluded. If you have conflicting evidence, does the law in Florida not require an evidentiary hearing? I don't see the evidence, you just – Just answer the question. If there is conflicting – The answer to your question is yes, absolutely. But I just don't see the evidence as conflicting. I see the evidence as all one-sided. Not only do we see that Carol Scheid did not participate in it, we know exactly who did participate in it. And the fact that the Miami – a document exists with the DSV's Miami address on it, that seems not good enough for purposeful availment or to meet the long-arm statute. A document with the Miami address is not good enough. I mean, that would be DSV's position. Your Honor, I would have liked to say – now I see I'm at 13 seconds. But I would have liked to say that the most important – You're in the negative time right now. Oh, okay. Okay. I'm sorry, Your Honor. But if our presiding judge – The one thing I would like to say is I think the most important documents in the case, Your Honor, are at 200-10 and 200-11. They are the actual Miami Customs clearance forms. Because you see all of the information on those forms, which show that everything DSV said was credited and seen by Customs, and the cargo was released. It says freight remaining on board. It says it's the vessel – where the vessel is heading. It doesn't – there's no information that DSV provided that was in any way wrong or misleading. And that's a whiff I get in the complaint. It makes it seem as if this scheme was to trick Customs. Customs cleared the vessels. You know, DSV was initially skeptical of the entire idea, as of course lots of the emails in the case suggest. Because why would you want to have a vessel come to the United States and then go to Cuba? Because that might be problematic. But there was no – there was – if anything, it just shows the absence of a conspiracy. The emails in the case are people saying, what? Why would we do this? It's not a conspiracy. It's literally a compliance official trying to figure out what makes sense. That isn't how conspiracies sound. Conspiracies sound like the first case we just heard argued, where people have a plan and they text one another about things. This is – the documents in this case show people struggling with one another. Thank you. Thank you, counsel. Mr. Carver. Christopher Carver on behalf of BBC Singapore and BBC USA. With respect to who hired the port agents, if you look at document 200, paragraphs 44, 45 – Can you say that again? I'm sorry. If you look at document 200, at paragraphs 44 and 45, that's a declaration, and then document 200-6, page 2, the hiring of the port agents was done by BBC carriers. So that's my – that was my understanding of the record as well, counsel, and now your opposing counsel will come up and tell me if there's any conflicting evidence. I think from my perspective, the best evidence for your – the other side against your client is this. And I'm reading from – I'm sure there are other copies of it, but I'm reading from docket entry 200-8, and this is an email chain starting with your client – starting with your client saying, hey, listen, happy new year. The jade is now done. We really like to have lessons learned – I'll call it the lessons learned email for the moonstone because we have some more things going on. And it's routed, and then eventually the port folks – and this is sent, sorry, directly to the port folks. And then the port folks in Miami list, hey, here's what happened, here's the kinds of things we really need to expedite this stuff, there's a really comprehensive list, including a note to the master, you need to provide these things. And then this is then routed to some other folks in the BBC chain saying, this is for And it's listed as – the subject is then changed at some point to BBC moonstone, the jade, Miami port call, lessons learned. How is that not an email directed at Miami, at least with regard to how the operation of the moonstone is going to go? First, when you say your client, two clients, and this is important – Fair enough. I'm talking about – and I apologize. BBC Singapore. And this email is not in any way evidence of a conspiracy. Well, it may not be, but that's not what I'm talking about right now. All that is is – Counsel, is that not at least doing something in Miami – again, this is assuming that I am right that causing, participating in, getting the ship to Miami is a violation of the act, is a violation of tortious act. And so then the only question is whether a defendant committed that tortious act. And is that email not directed at Florida, directed at Miami to agents in Miami, telling them this is how we're going to do the next ship in Miami, not an act, a tortious act directed at Miami or directed at Florida? That is not a tortious act in any way. Unless the court's – unless your Honor's view is that anything that touches a potential Helms-Burton violation constitutes a tortious act. Not touching it, but it seems to me that bringing here, given that it's described as foundational and essential that this thing be routed in a particular way, and that the ship actually does come to Florida as a necessary predicate for it going to Cuba, that seems to be causing, participating in, or profiting from the trafficking. I believe that to be the case. My only question is, did you all, as opposed to other corporate entities, direct or participate in that through an act in Florida? And is that email not, with communicating with Florida folks about how the next shipment is going to go, put you in the dock regarding that? I don't think so, Your Honor, because this email is what happened, it's like one bus driver asking another bus driver who had the route before what happened. But since we're going down this route, and I have very little time, in the Arraderos case, the court found that a Helms-Burton violation that occurred in Florida, in the sense that the plaintiff was a Floridian, was not enough for personal jurisdiction. Right, but, I mean, I guess my, the issue I'm having is that at the end of the day, that email talks about the lessons learned, which was that there was an issue with the transpired because it had come from Cuba directly to the port, and so they just pretended that that was not going to happen, and they hit it under the rug. I think that's my understanding. No, Your Honor, that's, that is a mixing of two cargos. There were two cargos on the Moonstone, the Jade had one cargo, there were two cargos on the Moonstone. The second cargo was for McDermott, it was going to Port Arthur. McDermott didn't want its cargo going anywhere near Cuba. Whether there was a contractual violation with McDermott by BBC. And look, I understand here, we're not here on the merits, we're here on jurisdiction, and whether or not there is a jurisdictional basis for the defendants to be sued under the Helms-Burton Act. And Your Honor, I think the answer to that question is no, and I'm running, I've seriously run out of time. But there are two things, one, they did not object in their objections to Judge Gales to the lack of an evidentiary hearing. They can't argue that here. There was substantial evidentiary consideration by the Magistrate Judge, and the Magistrate Judge basically got it right, and I would like to direct the Court's attention to one other case. I'm not sure that they got it right when they didn't think that there was an initial violation, but okay. Well, I think that in terms of personal jurisdiction, I think the Magistrate Judge got it right, and I'd like to direct the Court to the Associated Transport Line v. Productus Vincenterios Proficol case, which is 197 F. 3rd, 1070. It's cited in Oldfield. It's actually a case where Judge Wilson was on the panel. And in that case, there was a CERCLA violation that occurred in Florida Waters. The plaintiffs sued, claiming personal jurisdiction. The Court's decision was no personal jurisdiction because your claim is not the CERCLA violation, your claim is the misrepresentation of the chemical involved, and the misrepresentation occurred in Columbia. And one final point. If we're going to go down the complete Helms-Burton route, there was no way for any one of these defendants to know that Helms-Burton was remotely involved, because the complaint attaches Really? No, no, no, no potential? Is that why LM needed, under the allegations in the complaint, LM said, well, we don't want to be in violation, GE doesn't want to be in violation of the sanctions against having any products sold in Cuba? Your Honor, we're talking about two different things. There was no violation of the customs regulations. We're talking about- All the defendants knew that LM needed to have a port in the United States in order to be able to comply, correct? Your Honor, that's correct. And the port- What was the potential violation? What were they afraid of? No, but this case is a Helms-Burton case. And there is no way for any defendant to have known that Helms-Burton was remotely involved here because the Foreign Claims Settlement Commission does not say Puerto Carapano anywhere. There's no way for any defendant to have known that the port to which these turbine blades were going would have triggered a Helms-Burton claim by any entity. They knew that the port was in Cuba, correct? Yes, Your Honor. And the legality of these things going to Cuba, Helms-Burton aside, is shown by the customs clearances, which are at 50-6 and 50-5. And customs explicitly cleared these blades to go to Cuba in both shipments, knowing exactly where they were going. So there was no regulatory violation on the one hand, and there could have been no knowledge, and knowledge is part of Helms-Burton. You talked about one, two, and three. But knowing and intentionally, there is no way for a defendant to know of a Helms-Burton violation here because no defendant could have known that Puerto Carapano was claimed by NASI. Thank you, Your Honors. Thank you, Mr. Carver. And Mr. Bono, you've reserved some time for rebuttal. And why don't you tell us how were the defendants to know that a Helms-Burton claim was implicated here? Well, Your Honor, I can briefly do that, but that really, to the extent that whether or not there was a knowledge basis for these defendants is really a question for 12b-6. Those issues are open on the 12b-6 motion and not really present here today. So unless— Well, you have to demonstrate that there's enough evidence that they purposely availed themselves of being subject to suit in Florida, right? Absolutely, Your Honor. They came to Florida— Yeah, they need to have fair warning that there would be hell in the court here. Absolutely, Your Honor. And they came to Florida in order to take advantage of the laws of the United States for purposes of the sanctions that they were concerned about. Helms-Burton was on the books and has been since 1996. It's a law that exists. I don't know that they have to have had an email somewhere that says, here are the 17 laws that we have to worry about when we touch the United States in order to be on notice of the laws, all of them, when you come into the United States, you have to abide by all of our laws. I think their knowledge argument, though, is a little more sophisticated than that. At least what I just heard from your opposing counsel is what they're saying is there's no way we knew this particular port was a prohibited space in Cuba. Not that we didn't know Helms-Burton exists. I'm sure that everybody knew it existed, especially in the Venetian parts. But what they're saying is the name that was part of the list in the 60s was different than the name of this particular port now, and there's no way that we knew that this was that. Right? That is certainly what he said when he came up here. Again, that wasn't a decision. The district court didn't even touch this issue. It wasn't decided on the motion below. There was no objection to it, the R&R. There was no appeal based upon it now. So I don't really think this issue is really present, but to the point of I think where Judge Lagoa was going, every port, every piece of the dirt in Cuba was seized. I didn't know there was an exception. From somebody. Maybe Guantanamo, I guess. Yeah. So the Castro government took it off. So if you're going to Cuba, you are on someone's property that belonged to somebody that wasn't the Cuban government until the Castro government. Because all property in Cuba, except for Guantanamo, belongs to the Cuban government, and even then they lease it to the United States government. Correct. That's right. So I think that's ultimately where we go. But honestly, to the extent that we need to discuss that issue, I think we should brief it because it hasn't currently been briefed, and it wasn't really on appeal. Now- Is anyone in Florida alleged to be harmed here? So we've not made any allegations that there was an individual. The plaintiffs here aren't Florida residents. And so, no. None of our allegations relate to an injury felt in Florida because the plaintiffs weren't here in Florida. All of our allegations relate to a tort committed in Florida. And I want to circle back- The underlying tort is a federal- Sorry. A violation of the Humboldt-Curtin Act that would qualify as a tortious act under the Florida law. So I want to circle back to your original question, which is, what did everybody do? What did somebody do in Florida, right? So all of these defendants, again, want to run away from the fact- You had an opportunity to look at the record. I have. And I want to get to that. I was going to circle back to that last- Is my understanding correct? So our best record sites for our position that BBC Singapore was the one that was really acting through those agents are 218 and 55- That's not quite what you said when you were up here originally. So let me- I had a transcript. I believe it would say that BBC Singapore hired the port agents. So BBC Singapore was acting for and admitted that they were the agents for BBC carriers. With regard to negotiating the original deal, I don't know that they said for all purposes, for all times. Sure. And then, subsequently, they engaged with and sent the email that you spoke to earlier and were the ones communicating with those port agents. We don't have any evidence that BBC carriers was directly involved. Is there any other significant communications? That's the one that I've focused on, but I don't know that I saw any other significant communications between BBC Singapore and the port agents on the ground. I think that's certainly the most significant communication that I'm aware of. Absolutely. I just want to quickly talk about Goldwyn because we didn't talk about them the first time around. Your Honor asked a question that was basically, look, this ship got to the port of Miami. It did something in the port of Miami. It participated. It profited from. It got here. It didn't get here by accident. Somebody drove it here. All of the parties in this case, separate from Goldwyn, were hired in order to affect that ship getting through the port of Miami and ultimately going to Cuba. Because if you go all the way, if you back up far enough, then you see Goldwyn is the initial party that entered into this agreement with the Cuban energy company. It's Goldwyn who is building this wind farm. It's Goldwyn that needs these turbines made, needs these turbines to get to Cuba. It's Goldwyn that hired all of the BBC. The problem is, though, an act needs to be committed in Florida. So it's just not enough that these guys participated in something not directed and not done in Florida. Because there's a lot of other folks that are not at that table who were much more directly involved and were literally on the ground in Florida. And so you still have to show, in my mind, something happened in Florida that committed that torturous act. In my view, I just don't see how you get around that. So I agree with you. And what I would say is that the ship coming to Florida, what it happened, it was for Goldwyn that they hired another company to drive the ship there. It doesn't mean that they didn't direct the ship. The ship came to Florida for them. Isn't the allegation, you can tell me if I'm wrong, but isn't the allegation that in order to further the conspiracy, the ship had to come into a port in the United States, and the port that was chosen was Miami? And that's where the in furtherance of the tort that was committed? That's correct. I believe that is correct. Okay. I think my time's up. If anybody has any more questions? I don't think so. Thank you. Thank you, counsel.